[No. S026614. Aug. 19, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES GREGORY MARLOW, Defendant and Appellant.

## Counsel

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and Robert R. Anderson, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, William M. Wood and Pamela Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—Defendant James Gregory Marlow pleaded guilty to a charge of burglary and to the murder, kidnapping, robbery and rape of Lynell Murray. (Pen. Code, §§ 459, 187, 207, 211, 263.)[1] Defendant admitted special circumstance allegations that the murder had been committed during the course of robbery, burglary and rape, and that he was armed with a firearm in the commission of the offenses; following his waiver of a jury trial, in a separate proceeding the trial court found he had suffered two prior serious felony convictions. (§§ 190.2, former subd. (a)(17)(i), (ii), (iii), (vii), 12022, subd. (a), 12022.5, 667, subd. (a).) The jury returned a verdict of death. The superior court denied defendant's application to modify the verdict (§ 190.4, subd. (e)) and sentenced him accordingly. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

Because defendant pleaded guilty to all charges and admitted all special circumstance allegations at the conclusion of the prosecution's case-in-chief, and now raises no claims of error relating to the guilt phase evidence, we need only summarize briefly the evidence of his guilt.

On November 12, 1986, Lynell Murray was working at Prime Cleaners in Huntington Beach in Orange County. Murray, a college student, had planned to meet her boyfriend, Robert Whitecotton, after she finished work at 6:30 p.m. At 6:00 p.m., a customer saw defendant and Cynthia Coffman, embracing passionately, in an alley behind Prime Cleaners. When Murray failed to show up for their date, Whitecotton went to Prime Cleaners and saw that the store was closed and Murray was gone, although her car remained in the parking lot. At 8:30 that evening, Mooshang Movafaghi, the proprietor, discovered the store had been ransacked and the day's receipts, along with the cash that should have been in the register for the start of the next day's business, and some clothing were missing.

That same evening, Coffman, using Murray's credit card, checked into room 307 at the Huntington Beach Inn, signing the register in Murray's name. A few minutes later, a balance inquiry and a withdrawal of $80 were made on Murray's checking account at a Versateller at the Corona del Mar

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

branch of the Bank of America. One minute later, an additional $60 was withdrawn, leaving a balance of less than $10. The next day, November 13, a hotel employee found Murray's body in the bathroom of room 307. She had been beaten and strangled with a strip of towel; her head, bound with towels, was submerged in shallow water in the bathtub. Postmortem examination revealed sperm in her vaginal area; her maroon bra, pantyhose and one earring were missing.

Later, Coffman checked into the Compri Hotel in the City of Ontario, again using Murray's credit card. Around midnight on November 13, in a nearby Denny's restaurant, a waiter serving Coffman and Marlow saw them kissing and cuddling.

Defendant and Coffman were arrested the following day as they walked along a road in the Big Bear area in San Bernardino County, where law enforcement officials had learned a man and a woman were attempting to use Murray's credit card to purchase clothing in two different sporting goods stores. In Coffman's purse were identification cards belonging to Lynell Murray, credit card receipts bearing Murray's forged signature, an earring matching the lone earring found in Murray's ear when her body was discovered, a loaded revolver and ammunition, and a brown bag with money taken from Prime Cleaners. A search of a room defendant and Coffman had rented at the Bavarian Lodge in the Big Bear area yielded clothing stolen from Prime Cleaners, including a gray suit jacket defendant had been seen wearing.

After defendant's and Coffman's arrest, police found a white Honda belonging to Corinna Novis, a resident of Redlands in San Bernardino County who had been missing since November 7. The car was parked off a highway near Santa's Village, an amusement park in San Bernardino County. In a trash can on the park premises, a maintenance worker found a pillowcase containing the bra and pantyhose worn by Lynell Murray on November 12, personal checks made payable to Prime Cleaners, laundry receipts from the same establishment, and a matchbook from the Compri Hotel. Defendant's fingerprints and palm prints were found on the Honda.

On November 15, the body of Corinna Novis was found buried in a shallow grave in a vineyard in San Bernardino County. The cause of death was ligature strangulation; sperm was found in her rectum. The prosecution presented evidence that defendant and Coffman had abducted Novis from a shopping center in Redlands on November 7 and taken her to the home of Richard Drinkhouse, where they held her in a bedroom and tried to obtain her personal identification number (PIN) in order to access her bank account. After defendant's sister, Veronica Koppers, arrived at the Drinkhouse residence, Drinkhouse overheard Marlow tell her of his plan to go to Novis's

apartment to see if he could find anything there. Marlow apparently then took Novis into the shower; later, with wet hair and wearing only trousers, he entered the living room and told Drinkhouse he had gotten the PIN. Soon thereafter, defendant and Coffman took Novis, her wrists in handcuffs and duct tape over her mouth, from the residence. The following evening, November 8, defendant and Coffman visited the home of Paul Koppers, Veronica's husband. Defendant told Koppers he had acquired a car and needed to get license plates that were not easily traceable. On November 11, the manager of a Taco Bell restaurant in Laguna Beach recovered various items, including a checkbook and bank card in the name of Corinna Novis and identification cards belonging to defendant and Coffman, from a bag near a trash receptacle behind the restaurant.

## B. *Penalty Phase*

### 1. *Prosecution case*

In addition to the evidence of the murders of Lynell Murray and Corinna Novis presented during the guilt phase, the prosecution introduced further evidence of defendant's crimes against Corinna Novis, as well as other violent criminal conduct and a 1978 conviction for escape in Kentucky.

Regarding the offenses against Novis, the prosecution introduced defendant's testimony in his February 1989 capital trial in San Bernardino County, in which he had admitted kidnapping and robbing Novis before strangling her.

The prosecution also introduced evidence that on approximately July 7, 1986, in Whitley County, Kentucky, defendant and Coffman murdered Gregory Hill for financial gain. Hill's body was found on Upper Mulberry Cemetery Road, about a tenth of a mile from his residence. The cause of death was a single gunshot wound to Hill's lower right forehead, with powder stippling around the entry wound. In his February 1989 trial in San Bernardino County, defendant admitted he and Coffman had been paid a little more than $5,000 to kill Gregory Hill. Marlow contended he had initially changed his mind about killing Hill and that Coffman had indicated she would kill Hill by herself. Defendant ultimately acknowledged, however, that—as they had planned—Coffman, feigning car trouble, lured Hill to a truck parked on the roadway near his house, whereupon defendant emerged from a nearby hiding place and demanded to know what Hill was doing with his sister. Hill drew a gun and pointed it at defendant; in the ensuing struggle over the gun, Hill was shot.

The prosecution also presented evidence that defendant had committed three robberies in 1979. In the first incident, early in the morning of

November 5 of that year, defendant and a confederate, Allen Smallwood, came to the door of Jeffrey Johnson's apartment in the City of Upland and asked Johnson whether he worked in construction. When Johnson answered in the affirmative, defendant hit him in the face with a motorcycle chain and knocked him to the ground. Defendant and Smallwood then entered the apartment and began to look for drugs. Finding none, they took $180 from Johnson's dresser, along with a kitchen knife and a sword they found hanging on the wall. Defendant and Smallwood, taking Johnson, then went downstairs and entered the apartment of sisters Lori and Kathy Liesch. Defendant and Smallwood ordered Lori to get out of bed. When she told them she had no clothes on, defendant tried to pull the covers off her until Smallwood told him to leave her alone. Defendant then began to search the apartment and surprised Kathy Liesch as she was returning home. Defendant took Kathy into the bedroom, where he and Smallwood tied the two women and Johnson up with electrical cord and warned them not to contact the police because they had taken their identification and would "come after" them. When Lori continued to cry after defendant demanded that she stop, he grabbed his crotch and told her he would take her in the other room and "shut her up." Smallwood urged him to leave her alone.

In the second incident, on November 6, 1979, defendant entered a leather goods store owned by Joanne Gilligan in the City of Upland. Gilligan was assisting a customer when defendant went to the counter. When Gilligan asked if she could help him, defendant replied that he had a gun pointed at her and she should lie down on the floor. Although Gilligan did not actually see a gun, defendant had his hand in the pocket of his sweatshirt, and it appeared he could have a gun there. Both Gilligan and the customer got down on the floor; defendant took money from the register, grabbed one or two coats and left.

In the third incident, on November 20, 1979, defendant and Smallwood entered a methadone clinic in the City of Ontario. Defendant was armed with a sawed-off shotgun, and Smallwood carried a pistol. After loading and racking the shotgun, defendant ordered clinic employee Gertrude Smith not to move. He pointed the shotgun at her as Smallwood went to another part of the clinic, confronted a physician and a nurse, and demanded they open the safe where the methadone was kept. At one point during the robbery, believing an alarm had been activated, defendant shouted to Smallwood to "shoot him in the head," referring to the physician. When the safe was at last opened, defendant and Smallwood fled with $10,000 worth of methadone.

### 2. *Defense case*

Various witnesses testified to defendant's family background and upbringing. Defendant's sister Veronica Koppers, who admitted a prior felony

conviction of being an accessory to the kidnapping of Corinna Novis, described their mother Doris Hill's open abuse of and addiction to drugs and alcohol and her practice of bringing "hundreds" of different men to her house for sex. From 1965 until her death in a trailer fire in 1975, Doris had been frequently arrested and confined for various offenses, serving a prison term that began in 1968. During Doris's incarcerations, defendant would be sent to foster homes. Doris also would leave defendant and Veronica with friends or relatives for indefinite periods until, "when it was convenient, [she] would come back." Doris supported her drug habit by stealing, sometimes asking her children to serve as lookouts. Once when Veronica was 12, Doris brought her to a house in Los Angeles and told her to wait while she went out and that she would be back. Instead, Doris went drinking and Veronica was raped by a man who lived there. While Veronica perceived Doris's shortcomings as a mother, defendant idealized her and was devastated each time she would leave them. When defendant was about 15, Veronica saw Doris inject him with heroin.

Defendant's half sister, Tina, the daughter of defendant's father, Arnold Marlow, testified that defendant came to stay with her family on two occasions. Arnold Marlow was an alcoholic who frequently beat his children and, according to Tina, had no interest in defendant. Sue Warman, Tina's mother, testified by videotape and confirmed Tina's testimony concerning Arnold Marlow's abusiveness. She further testified that defendant, who was a quiet, withdrawn child, appeared badly neglected when he first came to stay with her family. The second time defendant came to stay, he "wasn't in . . . very good emotional health at all." Defendant protected Tina against her older brother Mike by "get[ting] very violent," to the point that Ms. Warman had to take Mike to the hospital for stitches. When Ms. Warman and Arnold Marlow concluded that defendant needed help, they contacted child welfare authorities, who placed him in a foster home.

Other witnesses corroborated Veronica's account of Doris Hill's neglect of her children and her open drug use in the home. Ray Saldivar, a former drug addict, testified that in 1965 he lived in Doris's house along with other persons who were openly using drugs and drinking. Doris paid so little attention to defendant and Veronica that Saldivar did not realize there were children in the house until he had lived there for some time. She was "kind of a rough person," who bought Saldivar a gun for his birthday. Defendant, who was quiet and withdrawn, and his sister spent a lot of time in their bedroom. Lillian Zamorano testified that she met Doris Hill in a bar in the Pico Rivera area in 1966. At that time, Zamorano, who had five children, had never used drugs; Doris introduced her to Seconal and amphetamines, which she used along with heroin. Zamorano moved in with Doris, and the two spent most of their time in bars and nightclubs, bringing people to the house to drink and use drugs. During most of this period, Doris's children lived with her mother,

Lena Walls; Doris visited infrequently and Zamorano first learned of the children's existence when, after living with Doris for two years, Doris invited her to visit her mother. At one point, defendant and Veronica stayed with Doris for about a month until Doris tired of their presence and took them back to her mother. Doris allowed defendant, who was about 13 years old at the time, to drink alcohol and smoke marijuana in the home, reasoning it was better that he do so around her than in the street.[2] Rosemary Casillas, Zamorano's daughter, confirmed her mother's description of the chaotic conditions prevailing in the household when they lived with Doris. One Christmas day, as Zamorano and Doris prepared to go out drinking, defendant pleaded with his mother to stay with him. She ignored him and left; he cried and threw the radio she had given him to the floor, smashing it. Defendant, Veronica and Casillas would go to various bars looking for their mothers. When located, the women would tell the children to wait for them or walk back home; they would not go with the children. Once, when Casillas was 13 or 14 and Doris was no longer living with Zamorano, Casillas ran away from home to the place where Doris was staying. She saw Doris inject defendant with heroin and Doris offered some to Casillas. Doris injected Casillas with the drug; it made her ill.

Terry Sydnes testified that in 1971 he and his wife and children lived across the street from the house where defendant, Veronica and their grandmother were living. Doris told him the children were a mistake and she did not really want them. Defendant spent quite a bit of time at the Sydneses' house and eventually moved in with them for about six months while they attempted to become his foster parents through the juvenile probation department. Sydnes believed defendant had become unruly because he was never loved and was looking for attention. Sydnes and his wife believed defendant needed psychological treatment, but they could not afford to provide it and the county refused to help them. Sydnes concluded he could no longer care for defendant when his wife discovered drugs in the house.

The defense also presented expert psychological testimony. Peter Chambers, Ph.D., a clinical and forensic psychologist and a professor of pediatrics at the University of California at Irvine, testified about the psychological aspects of early development, specifically the child's development of attachment to the parents and the effects of abuse during the first years of life. Dr. Chambers, who had neither interviewed defendant nor read any materials associated with the case, opined that the impact on the emotional development of a child growing up in a household where he observes large-scale drug abuse and his mother engaging in promiscuous sexual activity would be

---

[2] Zamorano later became involved in religion and abandoned the lifestyle she had adopted when living with Doris.

severe. Dr. Chambers concluded that abuse and neglect similar to that suffered by defendant as a child and an adolescent could produce a borderline personality disorder with elements of psychotic, neurotic and psychophrenetic[3] neurotic behavior.

Clinical psychologist Michael Kania, Ph.D., spent about 70 hours interviewing defendant and reviewed documentary material generated by law enforcement, along with reports by persons who had known defendant when he was growing up. Dr. Kania testified defendant tended to minimize the mistreatment he had endured, compared with the accounts offered by his friends and relatives. Defendant's natural father, Arnold Marlow, had a drinking problem and was inordinately strict with him; his mother's second husband was "even more pathological and even more severe." Defendant had been so desperate to gain his mother's affection and attention that he would do anything she asked or that he thought would please her, and he never stopped hoping she would come back and act toward him as a mother should. His mother had introduced defendant to marijuana at age eight and to heroin at age 11, had sexual intercourse with numerous men in his presence, and encouraged him to steal from them. She became sexually involved with defendant, taking showers with him at age 12 to 13, and although defendant was reluctant to talk about it in any great detail, there was some indication he had engaged in sexual relations with his mother at her urging.

Dr. Kania characterized the level of emotional abuse and mistreatment defendant had suffered during his childhood as "extremely severe and perhaps the most severe of anyone" in the thousands of evaluations he had completed.

As an adult, defendant tended to develop relationships with women like his mother. They used drugs and often were sexually promiscuous, living the same sort of unstable life he had been exposed to as a child. From 1980 to 1983, defendant was incarcerated in prison for his robbery convictions. From the time of his release until he met Coffman, he had no arrests, successfully completed parole and held jobs. He married a woman named Kathy Duitsman; the marriage ended when she shot another woman in a bar after Kathy and defendant had a misunderstanding.

Soon after, he met Coffman, with whom he fell in love because she immediately reminded him of his mother. He was willing to do anything to make her happy. After the killing in Kentucky, Coffman threatened to call the police if defendant did not do her bidding. As a result, defendant felt trapped. Coffman wanted to acquire funds to get her son back from her former in-laws, and the Orange County and San Bernardino County homicides were

---

[3] Dr. Chambers defined this term to mean "angry and mad."

the product of Coffman's desire for money and defendant's attempt, by doing what she wanted, to please her and avoid abandonment. Dr. Kania opined that the crimes would not have happened had defendant not met Coffman. After Murray's murder, defendant—tired of the situation—essentially gave up, purposefully discarding evidence in a way likely to lead the police to Coffman and himself.[4]

## II.  ANALYSIS

### A.  *Failure to Prosecute Orange County and San Bernardino County Homicides in Single Proceeding*

Defendant asserts the prosecutors in his Orange County and San Bernardino County cases each proceeded on the theory that the two murders had formed part of a single course of conduct, namely a "unified plan" devised by Marlow and Coffman to obtain money to finance a trip to Arizona. Thus, defendant contends, his trials in separate proceedings on the Orange County and San Bernardino County murder charges violated section 954, the prohibition against being twice placed in jeopardy for the same offense, and his right to due process of law. He further contends his trial counsel rendered ineffective assistance in failing to seek consolidation of the offenses in a single proceeding. These errors, he asserts, violated his rights under the Fifth, Sixth and Fourteenth Amendments to the federal Constitution and article I, section 15 of the state Constitution.

Defendant forfeited this claim of error by failing to object to the separate prosecutions or to move for joinder below. (Cf. *People v. Maury* (2003) 30 Cal.4th 342, 392 [133 Cal.Rptr.2d 561, 68 P.3d 1] [failure to move for severance forfeits claim of error].) Were we to address it on the merits, we would reject defendant's contention.

■   Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." The statute thus permits but does not require joinder under some circumstances. Section 654 provides that when an "act or omission . . . is

---

[4] In a separate trial, Coffman was convicted of Murray's murder with special circumstances and received a sentence of life without the possibility of parole. The Court of Appeal for the Fourth District, Division Three, affirmed that judgment, and this court denied review.

Defendant and Coffman were jointly tried in San Bernardino County for Novis's murder, with special circumstances; each was sentenced to death. This court affirmed that judgment. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

punishable in different ways by different provisions of law," an "acquittal· or conviction and sentence under any one bars a prosecution for the same act or omission under any other."[5] Defendant relies on *Kellett v. Superior Court* (1966) 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206], in which this court, interpreting section 654, stated: "[S]ome acts that are divisible for the purpose of punishment must be regarded as being too interrelated to permit their being prosecuted successively. . . . When . . . the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offenses omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett, supra,* at p. 827.) Contrary to defendant's argument, *Kellett* is not controlling. ■ As we noted in *People v. Carpenter* (1999) 21 Cal.4th 1016, 1038 [90 Cal.Rptr.2d 607, 988 P.2d 531], "the murder of separate victims on separate days in separate counties is not a single act or even a 'course of conduct' [citation] requiring a single prosecution." ■ Examining section 790, governing venue in murder prosecutions, *Carpenter* concluded that no authority compels murders committed in different counties to be tried together. (*Carpenter, supra,* at p. 1039.)

■ Defendant therefore was not denied due process or the constitutional protection against double jeopardy by successive prosecutions for the San Bernardino County and Orange County offenses. Accordingly, defendant's trial counsel did not render ineffective assistance in failing to object on this basis because to omit making a nonmeritorious objection does not amount to deficient performance. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017] [claim of ineffective assistance requires a showing that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that a reasonable probability exists that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different].)

B. *Alleged Faretta Error*

Throughout the proceedings in San Bernardino County and initially in the present case, defendant was represented by Attorney Ray Craig. In February 1990, however, a few months after defendant's sentencing in the San Bernardino County case and before any motions had been heard in this case,

---

[5] The version of section 654 that was operative at the time of defendant's offenses and trials was substantially similar to the current version, quoted in the text.

the superior court granted defendant's *Marsden* motion (see *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) and relieved Craig and his associate, William Byhawer. The superior court then appointed Attorney C. Thomas McDonald, but McDonald withdrew from representing defendant because he could not come to an agreement with the county regarding his fees. The superior court then appointed Attorney Ron Brower, but on April 6, 1990, defendant wrote a letter to the court, objecting to Brower as his attorney. At the next hearing, on April 25, 1990, Brower informed the court that based on allegations in defendant's letter, he could not represent defendant; the court then relieved him.

After discussing somewhat the procedure for obtaining replacement counsel for Marlow, the court said: "Mr. Marlow, we haven't asked you. You are without an attorney right now, but I will assume by relieving Mr. Brower that's your desire, is that correct?" Defendant replied: "Yes, it is. Sir, may I address the court?" The court answered: "Surely." Defendant continued: "Mr. Brower, as I understand, wasn't on the court list." Defendant explained he wished to pick another attorney who was not on the court list and whom he could trust and work with. The court spoke further of the process for appointing counsel and invited defendant to continue. Defendant talked about the trusting relationship he had had with McDonald. The court elaborated on its understanding of the fee-related reasons why McDonald had withdrawn from representing defendant and on the county's procedures for appointing counsel, noting: "As far as you looking at the list and selecting someone off the list and so forth, I don't think that's proper. It hasn't been done before, and I don't think we can make an exception. [¶] All the gentlemen on the list and so forth have been screened and are outstanding attorneys. In other words, [if] you had five million dollars to go out and select an attorney, you'd end up selecting one of the attorneys on the list, I am sure. That's neither here nor there. [¶] The only thing I can tell you is we will go through the procedures and select the next attorney." Further discussion ensued on the appointment process and a motion filed by Marlow in propria persona, the denial of which he had been trying to appeal. As to the latter, the court stated it would take the matter off calendar so that the attorney eventually appointed to represent defendant could determine whether to pursue writ relief. The court and counsel then turned to trial setting, and the court indicated it would direct Mike Horan, an attorney who was on the court list for appointed counsel in capital cases and who happened to be present in the courtroom, to "fill in and sit with Mr. Marlow, take the necessary waivers, see where we are going." The court further indicated it anticipated putting the matter over for a couple of weeks to allow defendant's new attorney time to familiarize himself with the case.

After an interruption in the proceedings, defendant spoke up: "Your honor, excuse me. Is it possible that I just go pro per in my own defense and have

someone appointed as co-counsel?". The court answered: "No. That's an absolute disaster. There's no authority for that. That doesn't work out. There's no authority—some judges have done that, much to my chagrin. I am trying to think [of] the case I ended up with that happening." The prosecutor said: "It is possible in an unusual case, however." The court stated: "I will decline to do that at this particular time."

After another interruption in the proceedings, defendant again spoke: "Seems to be—your honor, excuse me. I be allowed to have one lawyer, only allowed a certain amount of time to do the trial, a certain amount of manpower and hours while the district attorney and the public defender's office have unlimited resources and manpower on a salary type of thing. It seems kind of unfair."

After still another interruption, the court stated it would be necessary to allow a couple of weeks to obtain counsel from the court's list of attorneys and to allow that attorney to determine whether appropriate arrangements could be reached. The court then proceeded to call Attorney Horan to discuss with defendant the need to waive time in order to obtain new counsel. Horan asked defendant: "That make sense to you?" Defendant answered: "Yeah, it makes sense to me, but I think I am going to have the same problem whatever attorney is appointed to me isn't allowed the proper time for a death penalty defense and the manpower and resources like my opposition has." After further colloquy, Horan asked defendant: "You willing to do that, willing to waive time?" Defendant said: "Yes, sir." The matter accordingly was put over for two weeks.

■ Defendant contends the trial court erred in denying his motion for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. As defendant asserts, we have held that if a defendant in a criminal case wishes to represent himself or herself and makes an unequivocal assertion of that right within a reasonable time prior to the commencement of trial, the request must be granted. (*People v. Marshall* (1997) 15 Cal.4th 1, 20–21 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Windham* (1977) 19 Cal.3d 121, 127–128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Respondent contends this contention was forfeited by defendant's plea of guilty on the advice of subsequently appointed counsel. Although not relying on the absence of a certificate of probable cause (see §§ 1237.5, 1239, subd. (b); Cal. Rules of Court, rule 30(b)), respondent argues the claim of erroneous denial of a *Faretta* motion is not one going to the "legality of the proceedings" and thus is not cognizable on appeal. (§ 1237.5; *People v. Hobbs* (1994) 7 Cal.4th 948, 955 [30 Cal.Rptr.2d 651, 873 P.2d 1246].) We disagree. ■ Just as a claim of denial of the right to counsel is cognizable on appeal after a guilty plea (*People v. Holland* (1978) 23 Cal.3d 77, 85 [151

Cal.Rptr. 625, 588 P.2d 765]), so too is a claim of *Faretta* error (*People v. Robinson* (1997) 56 Cal.App.4th 363, 370 [65 Cal.Rptr.2d 406]).

■ We conclude, however, that defendant did not make an unequivocal request for self-representation. Reading the pertinent exchange in the context of defendant's frustration with his inability to obtain the counsel of his choice, we find it clear that defendant's inquiry—"Is it possible that I just go pro per in my own defense and have someone appointed as co-counsel?"— was a request for information, not a *Faretta* motion. That the trial court went on to "decline to do that at this particular time" did not convert defendant's inquiry into a motion.[6] This conclusion is strengthened by consideration of the ensuing discussion, in the course of which defendant, far from adverting to any desire for self-representation, reiterated his concern that any counsel eventually appointed to represent him would be disadvantaged by a limited fee arrangement rather than what he evidently viewed as the unlimited budgets available to the prosecutor and to defendants represented by the public defender.

## C. *Validity of Plea*

■ Defendant contends his guilty plea to murder with special circumstances must be set aside for lack of an express waiver of his rights to a jury trial and against self-incrimination, as required by the Fifth, Sixth and Fourteenth Amendments to the federal Constitution and article I, section 16 of the state Constitution. "[A] valid guilty plea presuppose[s] a voluntary and intelligent waiver of the defendant's constitutional trial rights, which include the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers." (*People v. Howard* (1992) 1 Cal.4th 1132, 1175 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) The reviewing court must determine whether the record affirmatively demonstrates that the plea was voluntary and intelligent under the totality of the circumstances. (*Id.* at p. 1178.)

Here, during the proceedings on the change of plea at the conclusion of the People's guilt phase case-in-chief, the prosecutor advised defendant as follows: "Now, when you plead guilty, you are going to be giving up certain

---

[6] Because defendant did not make an unequivocal request for self-representation, this case does not present the question we addressed in *People v. Dent* (2003) 30 Cal.4th 213 [132 Cal.Rptr.2d 527, 65 P.3d 1286], where the defendant made an unequivocal, albeit conditional, request for self-representation that the trial court denied on the erroneous basis that self-representation was unavailable in a capital case. (*Id.* at pp. 217, 219.) Here, the trial court correctly told defendant, in essence, that a defendant in a criminal case who elects self-representation is not entitled to the appointment of cocounsel. In other words, as the court made clear, a defendant does not have a right both to be represented by counsel and to participate in the presentation of his own case; indeed, as the court indicated, such an arrangement is generally undesirable. (*People v. Clark* (1992) 3 Cal.4th 41, 97 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

rights. And you have the right to be tried by a jury in a public and speedy trial. And so far in the guilt phase of this case, you have actually had a trial up to this point by a jury picked by your lawyers and yourself. [¶] When you plead guilty, you are giving up the right to have that same jury decide whether or not you are guilty and you are giving up that right to have the jury decide whether or not those special circumstances are true. [¶] Do you understand that you are giving up that right when you plead guilty?" Defendant responded: "Yes, sir." The prosecutor continued: "In the course of that trial, the trial we've had so far, you've had the opportunity through your lawyers or yourself, if you want, to confront the witnesses that are brought into the courtroom and to cross-examine those witnesses. And that's been done so far. [¶] When you plead guilty at this point, you are giving up the right to confront and cross-examine any other witnesses that the prosecution might want to bring in in the guilt phase. Do you understand that?" Defendant answered: "Yes, sir." The prosecutor inquired: "[Is that] what you want to do?" Defendant responded: "Yes, sir."

The prosecutor continued: "There is the right at a guilt phase of the trial to testify in your own behalf if you want. You can get on the witness stand and testify under oath, or you can sit in the courtroom with your lawyers and remain silent and not say anything at all. When you plead guilty, in effect you are giving up your right to remain silent because you are making a statement about these crimes. Do you understand that?" Defendant answered: "Yes, sir." The prosecutor asked: "Is that what you want to do?" Defendant responded affirmatively.

Defendant contends the record reflects merely that he was informed of his rights and expressed a desire to give them up, not that he actually did so. In the totality of the circumstances, however—in particular, defendant's having been represented by counsel and having participated in the trial to that point pursuant to his former plea of not guilty—we have no doubt his words signified actual waiver of his rights preparatory to his change of plea.

▆ Defendant further contends article I, section 16 of the state Constitution requires express waiver of the jury right in this context. He acknowledges we held in *People v. Ernst* (1994) 8 Cal.4th 441, 446 [34 Cal.Rptr.2d 238, 881 P.2d 298], that this provision does not apply when a defendant waives the right to trial by pleading guilty, but applies only when a defendant exercises his right to trial but waives the right to a jury. Defendant urges that "by creating a higher standard for the acceptance of a jury trial waiver when the accused chooses a court trial, where all that is waived is not the right to have the facts tried, but just the right to have a *jury* as the trier of fact, than the standard for the acceptance of a jury trial waiver when a defendant pleads guilty, thereby waiving his right to have any trier of fact adjudicate the

charges, is a denial of equal protection of the laws, guaranteed by the United States Constitution." He contends a defendant pleading guilty is situated similarly to a defendant forgoing a jury and electing a court trial, and that the constitutional provision differentially affecting the exercise of such fundamental rights can be justified only by a compelling state interest. To the contrary, a case involving a guilty plea, in which no issues are to be tried, is indeed different from one in which issues remain for trial before the court. (See *id.* at p. 448.) We therefore conclude article I, section 16 of the state Constitution, as we have interpreted it, is consistent with federal equal protection principles.

D. *Admission of Defendant's Testimony in San Bernardino County Trial; Claimed Ineffective Assistance of Counsel in Failing to Object*

During the penalty phase of this case, pursuant to Evidence Code section 1291,[7] the prosecution introduced excerpts of defendant's testimony under cross-examination in his San Bernardino County trial, in which he admitted he had kidnapped and robbed Corinna Novis in order to obtain money to go to Arizona and had strangled her, and described the circumstances of the killing for hire of Gregory Hill in Kentucky. Defendant contends his conviction must be reversed because it was the result of the improper denial, in the San Bernardino County prosecution, of his motion to sever his trial from that of his codefendant, Coffman, which denial in turn "impelled" his testimony in that case in order to rebut highly prejudicial evidence that Coffman presented in her defense. Defendant observes that his counsel in the San Bernardino County trial stated, in the course of an in limine hearing held just prior to defendant's testimony in that case, that defendant's decision to testify was necessitated by the accusations that Coffman and her witnesses had made against him.

Respondent would have this court dismiss the present claim at the threshold, arguing that the propriety of the San Bernardino Superior Court's ruling and the evidence presented in that trial stand outside the record on this appeal. We may, however, take judicial notice of the proceedings and our decision in the San Bernardino County case and hereby do so. (See Evid. Code, §§ 452, subds. (a), (d), 459.)

---

[7] Evidence Code section 1291 provides in relevant part that evidence of former testimony (including testimony given under oath in another action; see *id.*, § 1290, subd. (a)) is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the testimony is offered against the person who offered it in evidence in his own behalf on the former occasion. (See also Evid. Code, §§ 1220 [hearsay exception for party admissions], 1230 [hearsay exception for declarations against penal interest].)

Respondent further contends Marlow forfeited the issue by failing to object to the admission of his former testimony. He is correct. (*People v. Carter* (2003) 30 Cal.4th 1166, 1204 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Because Marlow asserts his counsel thereby rendered ineffective assistance, however, we turn to the merits of the claim.

While not asserting he was literally compelled to take the stand in the San Bernardino County case, Marlow relies on state and federal authorities recognizing that when a defendant was *impelled* to testify at a prior hearing or trial, either because of the nature of the proceeding in which he testified or because he was provoked into testifying by the improper introduction of evidence, that testimony may not be used against him in a subsequent hearing or trial.

In the first category of decisions Marlow cites, pertaining to particular types of proceedings, *Simmons v. United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967], for example, held that when a defendant testifies in a pretrial suppression hearing in order to assert his Fourth Amendment right to be free from illegal search or seizure of evidence, the prosecution may not introduce his testimony on the question of guilt. (*Id.* at p. 394.) *Simmons* reasoned that a defendant should not have to surrender one constitutional right in order to assert another. (*Id.* at pp. 393–394.) Similarly, *People v. Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024] held that the testimony of a probationer at a revocation hearing is inadmissible in the prosecution's case-in-chief in a subsequent trial on charges based on the same conduct that prompted the revocation. (*Id.* at p. 872.) We said: "When a pending or potential criminal charge forms the basis of an alleged violation of a condition of probation, a probationer who can explain his actions only by jeopardizing his chances of acquittal at a subsequent criminal trial may understandably feel that his opportunity to be heard is more illusory than real and that he is being deprived of his liberty without one of the essential elements of rudimentary fairness—a meaningful chance to speak on his own behalf." (*Id.* at p. 874.)

In the latter category, those in which a defendant's testimony is impelled by the improper introduction of evidence, Marlow cites *Harrison v. United States* (1968) 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008], in which the high court reversed a conviction predicated on the admission of a defendant's former testimony, which the court concluded had been impelled in the prior proceeding by the erroneous admission into evidence of his three confessions later determined, on appeal, to be involuntary. (*Id.* at pp. 222–223.) The court stated: "[W]e need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. . . . [¶] Here, however, the [defendant] testified only

after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby . . . ." (*Id.* at p. 222, fns. omitted.) Cited in *Harrison* (*id.* at p. 224, fn. 10) is this court's decision in *People v. Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715], in which we held that the erroneous introduction into evidence of an illegally obtained confession that arguably induced the defendant to admit his guilt in open court compelled reversal because "the record in th[e] case fail[ed] to dispel beyond a reasonable doubt the possibility that the defendant took the stand in an attempt to mitigate the explosive impact of a confession which had left his case in ruin." (*Id.* at p. 169; see also *Fahy v. Connecticut* (1963) 375 U.S. 85, 86–87 [11 L.Ed.2d 171, 84 S.Ct. 229] [reversing conviction upon finding a reasonable possibility that the introduction of illegally seized evidence prompted the defendant's testimonial admissions].) More recently, in *People v. Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180], we reversed a conviction after the trial court improperly admitted the preliminary hearing testimony of a witness who absconded before trial, when the prosecution had failed to use due diligence to secure the witness's attendance at trial. Relying on *Spencer, supra,* at page 169, we rejected the state's contention that the defendant's testimony sufficiently supported the conviction, because the record failed to dispel the possibility that the defendant's testimony had been impelled by the erroneous introduction of the witness's prior testimony. (*Louis, supra,* at p. 995.)

These authorities do not compel reversal of defendant's conviction in this case because we have concluded in *People v. Coffman and Marlow, supra,* 34 Cal.4th 1, that the San Bernardino Superior Court did not abuse its discretion in denying severance of Marlow's trial from that of Coffman. Coffman's evidence regarding Marlow's other bad acts, moreover, *was not admitted against Marlow,* and the jury in that case was instructed to consider it only insofar as it bore on Coffman's state of mind at the time of the offenses. That Marlow made the tactical decision to address Coffman's assertions in his testimony in the San Bernardino County case cannot be attributed to legal compulsion rendering that testimony inadmissible in this proceeding. (Cf. *Ohler v. United States* (2000) 529 U.S. 753, 759–760 [146 L.Ed.2d 826, 120 S.Ct. 1851].) His trial counsel, therefore, did not render ineffective assistance in failing to object to its introduction into evidence. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 687–688; *In re Avena, supra,* 12 Cal.4th at p. 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

E. *Exclusion of Mitigating Evidence*

Defendant contends the trial court erred in excluding evidence that Lena Walls, his grandmother and childhood caregiver, hated all men; in

excluding evidence of a neighbor's description of Ms. Walls; and by preventing defendant's expert from testifying as to "the mitigating psychological factors associated with strangulation as a method of homicide." The Eighth and Fourteenth Amendments to the federal Constitution require that the sentencer in a capital case not be precluded from considering as a mitigating factor any relevant aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. (*McCleskey v. Kemp* (1987) 481 U.S. 279, 304 [95 L.Ed.2d 262, 107 S.Ct. 1756]; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669].) The trial court, however, retains discretion to exclude evidence on grounds of irrelevancy. (*People v. Frye* (1998) 18 Cal.4th 894, 1015 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

■ We find no abuse of discretion in this case and, it follows, no constitutional error. Testimony that Ms. Walls hated men would have evidenced *her* character and state of mind, but—without more—would not have illuminated any circumstances of *defendant's* upbringing and character, because to assume her attitudes toward men in general would have negatively affected her treatment of her young grandson would be speculative. The jury, moreover, heard evidence suggestive of a less than optimal—indeed, chaotic—upbringing, including that Ms. Walls had been institutionalized in Kentucky and cared for defendant and his sister on minimal income from government assistance. In a related vein, the trial court's exclusion, as speculative and lacking foundation, of a neighbor's opinion of Ms. Walls's personality did not constitute an abuse of discretion and in any event carried no prejudice in view of the other evidence of Ms. Walls's limitations as a caregiver.

■ Finally, on this record we see no abuse of discretion in the trial court's sustaining an objection, on grounds of speculation and lack of foundation, to defense counsel's questioning of defense psychologist Michael Kania concerning whether, from a psychological point of view, strangling as a form of murder differs from any other form. Moreover, even assuming an abuse of discretion in the court's ruling, the error was harmless in light of defendant's admission that he intended to kill Murray, and the weight of the aggravating evidence. Defendant, moreover, was free to argue any "self-explanatory" inferences he wished, such as that strangulation presupposes lack of planning or acting out of rage, from the method of killing he employed. We reject defendant's related contention that the prosecutor improperly exploited the court's ruling with his closing argument that defendant, in strangling Murray, used "the most personal way someone can kill" and, in so doing, "crossed the line" "where we as a society say enough." The argument did no more than draw reasonable inferences from defendant's method of killing and urge a death verdict based thereon.

### F. *Alleged Caldwell Error*

Defendant contends the prosecutor, in closing argument, violated the rule in *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], and the trial court subsequently erred in refusing a defense-requested curative instruction. The combination of these errors, defendant argues, deprived him of a reliable penalty determination as guaranteed by the Eighth and Fourteenth Amendments to the federal Constitution. The issue arose in the following context: During his summation, the prosecutor argued to the jury: "We discussed during the jury selection about the unique aspect of this kind of a case and that it is the only type of case in California where the judge does not make the sentencing decision initially, the jury does." Defense counsel interjected: "Excuse me, your honor, I am going to object to the term 'initially.' It is the jury's decision. It carries." The prosecutor said: "I will rephrase it." The prosecutor went on to say: "It's the only type of case where in California the jury makes the decision what the appropriate penalty is to be."

At the conclusion of argument, defense counsel asked the court to instruct the jury that, in rendering its decision, each juror was to assume the penalty selected would be carried out. The trial court declined, noting: "I think I covered that so often in voir dire that death means death and life without parole means life without parole. I think I hammered that during voir dire. I don't think they would ever pick up on initial determination. We've got to give the jury some credit for having some amount of common sense. I don't think it's necessary. I will deny the request."

■   *Caldwell v. Mississippi* held it "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell v. Mississippi, supra,* 472 U.S. at pp. 328–329.) Given the brevity of the prosecutor's remark, the immediate speaking objection from defense counsel, and the prosecutor's equally prompt rephrasing to eliminate any conceivably incorrect inference, we see no reasonable likelihood the jury understood the remark as diminishing its responsibility for the sentencing determination. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

■   Nor did the trial court err in refusing the requested curative instruction. In *People v. Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37], we found the identical instruction to be inaccurate, in that it ignored both the power of the superior court to reduce a death sentence under section 190.4, subdivision (e), and the Governor's power of commutation. Defendant contends the rule in *Thompson* was effectively overruled in *Simmons v. South*

*Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187], in which the high court ruled that when the prosecution urges a capital jury to sentence a defendant to death because of a potential for future dangerousness, due process dictates that the trial court cannot prevent the jury from learning the defendant is ineligible for parole under a sentence of "life imprisonment." (*Id.* at p. 169.) But in *People v. Musselwhite* (1998) 17 Cal.4th 1216 [74 Cal.Rptr.2d 212, 954 P.2d 475], involving a refused instruction that a sentence of life imprisonment without parole meant the defendant would never be paroled, we distinguished *Simmons v. South Carolina* on the basis that the trial court in *Musselwhite* did not prevent the jury from learning the defendant would be ineligible for parole. (*Musselwhite, supra,* at p. 1271.) As the instructions given in this case properly advised the jury of its sentencing responsibilities, the trial court was not obliged, sua sponte, to correct the defects in the requested instruction.

### G. *Asserted Denial of Due Process and Fair Trial by Virtue of Preceding Claims of Error*

Defendant contends the asserted errors discussed in the preceding sections constituted either direct violations of his federal constitutional rights or arbitrary deprivations of his liberty interest created by state law, thus derivatively denying him due process. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].) We conclude defendant has not demonstrated that any error infected his trial; thus, this contention lacks merit.

### H. *Constitutionality of Death Penalty Law*

Defendant challenges the constitutionality of the 1978 death penalty law on the following grounds, all of which have been rejected in the cited cases: the statute's failure to require (1) written findings as to the aggravating factors the jury employed (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]); (2) proof beyond a reasonable doubt of any aggravating factors, that aggravating factors outweigh mitigating, or that death is the appropriate punishment (*ibid.*); (3) jury unanimity regarding aggravating factors (*People v. Hillhouse* (2002) 27 Cal.4th 469, 510 [117 Cal.Rptr.2d 45, 40 P.3d 754]); (4) a procedure to enable a reviewing court to evaluate meaningfully the sentencer's decision (*People v. Hines* (1997) 15 Cal.4th 997, 1077 [64 Cal.Rptr.2d 594, 938 P.2d 388]); and (5) a presumption that life without parole is the appropriate penalty (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]). Defendant also complains that the statute invites arbitrariness and capriciousness by failing to designate which sentencing factors are aggravating and which are mitigating, by failing to require that the jury not consider inapplicable mitigating

circumstances, and by permitting allegations of unadjudicated criminal activity to be used as a basis for imposing death; as he acknowledges, we have rejected these contentions as well. (*People v. Jones* (2003) 30 Cal.4th 1084, 1128–1129 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Hughes* (2002) 27 Cal.4th 287, 404 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.