Filed 6/22/26  P. v. Cruz-Araujo CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064614 |
| v. | (Super. Ct. No. 23HF0566) |
| NICOLAS DAVID CRUZ-ARAUJO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge. Reversed and remanded.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Nicolas David Cruz-Araujo challenges his sex-crime convictions, contending the trial court erred by admitting his un-Mirandized[1] confession. The court concluded defendant's interrogation was not custodial and thus did not require *Miranda* warnings.

We conclude defendant confessed during a custodial interrogation. Thus, the failure to advise him of his *Miranda* rights required the court to suppress his confession. Because we cannot conclude the error was harmless beyond a reasonable doubt, we reverse.[2]

FACTS

I.

INITIAL ALLEGATIONS AND INVESTIGATION

In the summer of 2019, eight-year-old Victim 1 reported that defendant, one of her counselors at a Christian day camp, touched her inappropriately while they were seated together on the bus earlier that day.[3]

The next day, two detectives went to the church campus where defendant worked to interview him. The detectives wore suits and carried badges and firearms. The camp director provided them with a vacant office in one of the church buildings. When defendant arrived at work, the director led him into the office, where the detectives were waiting, then closed the door

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2] Defendant's challenge to the trial court's instruction under CALCRIM No. 1191B is foreclosed by *People v. Villatoro* (2012) 54 Cal.4th 1152, 1164. We cannot "reconsider that decision," despite defendant's urging that we do so.

[3] For simplicity, and to shield the identities of the alleged victims, we refer to them as Victims 1–4.

behind him and left. The detectives introduced themselves, displayed a badge, and asked defendant to sit down.

The recorded interview began in a casual tone. Detectives referred to defendant as "bro," told him he was not under arrest, and explained they just wanted to talk to him "super low key" to "clear the air and figure out what's going on."

After obtaining defendant's identifying information, the lead detective turned to the incident Victim 1 had reported. He told defendant that "somebody said something about an incident that happened yesterday" and added, "[W]e know a lot of the answers to all this, but we want to hear it from you . . . ." As defendant described the busses the camp used for transportation, the detective interjected that the buses "have cameras on them."[4]

In response to questioning, defendant provided general information about camp logistics and described sitting on the bus next to Victim 1 on the way back from the prior day's field trip. When asked if Victim 1 might have touched him inappropriately, defendant claimed she placed her hand on his thigh at some point and he moved her hand away. The detective sat next to him and directed him to reenact the incident. After the reenactment, the detective reiterated, "Um, like I said, Nicolas, there's cameras on there. Okay? . . . . And I need you to be completely truthful."

The detective told defendant he understood because defendant was only 19 years old and "[i]t happens." He then asked how often defendant

---

[4] At the time, the detective did not know if there were in fact cameras on the camp bus. Police did later retrieve video from the bus, but it was not useful.

had put Victim 1's hand in his pants. Defendant responded that it happened only once.

As questioning continued, the detective repeatedly asserted that defendant's conduct had been captured on video. In response to additional questioning, defendant admitted engaging in similar conduct with one other camper, nine-year-old Victim 2. The detective claimed that incident had also been recorded and said he saw Victim 2 trying to pull her hand away. The detective added that Victim 2 was a "good looking girl." Defendant admitted that he placed Victim 2's hand on his penis, under his underwear. He also admitted he was aroused.

At one point during the interview, defendant asked, "Am I getting arrested?" The detective responded that things were "not looking very good for [him]." At the detectives' urging, defendant then wrote apology letters to both victims. About 40 minutes into the interview, the detective advised defendant of his *Miranda* rights.

At the conclusion of the interrogation, the detectives arrested defendant. A search of his phone and computer later uncovered photos of young girls in provocative poses.

In the years following the initial report, two more victims reported similar incidents of sexual abuse by defendant on the camp bus. The prosecution charged defendant with several counts of committing a lewd act on a child under 14.

## II.

### THE TRIAL

Before trial, defendant moved to suppress his un-Mirandized statements to detectives. The trial court denied the motion, concluding defendant was not in custody during the interview and thus *Miranda*

4

warnings were not required. The court noted the interrogation was "a very pleasant conversation, as it starts out" and stated there was "no pressure put on the defendant through the course of the interview." Defendant's recorded confession was admitted at trial. The photos from defendant's devices were also admitted.

Victim 1 testified that defendant sat next to her on the bus while returning from a field trip. During the ride, defendant grabbed her hand, placed it on his private parts, and moved her hand in circles. She repeatedly tried to pull her hand away but he held it there. He then placed her hand under his shorts, and she could feel skin. She yanked her hand away forcefully and he stopped.

During the incident, Victim 1 called her mother because she wanted to tell her what was happening. But because defendant was sitting next to her, she instead asked her mother when her mother would be picking her up. At trial, Victim 1's mother confirmed receiving this call.

Victim 1's mother described Victim 1's later disclosure. When the mother picked her up from camp, Victim 1 said something inappropriate had happened but she needed to wash her hands before discussing it. That evening, the mother found Victim 1 crying. Victim 1 then reported that defendant made her touch his private parts on the bus.

The following day, Victim 1 repeated the allegations during a forensic interview and provided additional details. She became visibly upset when she identified defendant in a photo.

Victim 2 testified that she did not recognize defendant and did not recall anyone touching her inappropriately.

Victim 3 testified that in the summer of 2019, when she was about eight years old, defendant touched her while they were seated next to

each other on the bus on the way back from an excursion. Defendant took her hand and made her touch his penis. He also touched her vagina with his hand.

Victim 3's mother testified that the allegations involving Victim 1 became a major story in the summer of 2019. When learning about them, she asked Victim 3 if anything had happened to her at camp, but Victim 3 said no. A year later, Victim 3 disclosed the incident to her mother after hearing others discussing defendant. According to her mother, Victim 3 was visibly distressed during the disclosure. Victim 3 later repeated her account in a forensic interview.

Victim 4 testified about a similar incident that occurred in the summer of 2019, when she was eight years old. Defendant sat next to her on the bus on the way back from the pool. He placed his hand under her bathing suit and touched her vagina. He later grabbed her wrist and put her hand on his private part over his clothes. She pulled away, but he kept trying to do it. She provided detailed testimony about the surrounding circumstances. Victim 4 told her therapist about the incident in 2023.

Defendant testified on his own behalf and called multiple character witnesses.[5]

In closing arguments, the prosecution repeatedly referenced defendant's confession. The prosecutor argued the confession foreclosed any innocent explanation for defendant's actions and established his sexual intent when touching Victim 1. The prosecutor cited defendant's willingness to write apology letters as showing his consciousness of guilt. The prosecutor also

---

[5] As we explain below, defendant's testimony is irrelevant to the assessment of prejudice from the erroneous introduction of his confession. We therefore do not detail it.

highlighted defendant's attempts during the earlier parts of the interrogation to minimize his actions before eventually confessing. The prosecutor reminded the jury that it could relisten to the recorded statement during deliberations.

The trial court instructed the jury on CALCRIM No. 359 (Corpus Delicti), explaining that the prosecution was required to present independent evidence that a crime occurred, apart from defendant's out-of-court statements. The court also instructed on CALCRIM No. 1191B (Evidence of Charged Sex Offense), which permitted the jury to consider the defendant's commission of one charged sex offense in deciding if he also committed other charged sex offenses.

During deliberations, the jury asked if the corpus delicti doctrine applied to defendant's recorded confession. The court confirmed that it did. The jury found defendant guilty on all charges as to Victims 1, 3, and 4. It acquitted him of the charge concerning Victim 2. The court sentenced defendant to 25 years to life in prison.

DISCUSSION

I.

DEFENDANT'S UN-MIRANDIZED STATEMENTS SHOULD HAVE BEEN SUPPRESSED

We conclude the detectives subjected defendant to a custodial interrogation. Their failure to advise him of his *Miranda* rights therefore required the suppression of his confession.

Under *Miranda*, suspects questioned by law enforcement after being taken into custody must first be informed that they have the right to remain silent, that any statements they make may be used against them, and that they have a right to the presence of an attorney. (*People v. NavaAdame* (2025) 116 Cal.App.5th 1, 16 (*NavaAdame*).) If police interrogate a suspect in

7

custody without providing these advisements, the suspect's responses cannot be admitted to establish their guilt. (*Ibid.*)

The duty to advise suspects of their *Miranda* rights applies only if they are in custody. (*NavaAdame, supra*, 116 Cal.App.5th at p. 16.) "'[C]ustody is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."'" (*Ibid.*) In deciding if a person is in custody for *Miranda* purposes, the question is whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. (*Ibid.*) To answer this question, the court must examine all the circumstances surrounding the interrogation. (*Ibid.*)

Relevant considerations include (1) who initiated the contact; (2) whether the person agreed to the interview; (3) whether the person was questioned as a witness or suspect; (4) the interview's location; (5) whether police said the person was under arrest or in custody (6) conversely, whether they said the person was free to leave at any time; (7) whether the person's movement was restrained; (7) the length of questioning; (8) the number of officers; (9) the degree of police control over the interrogation; (10) whether officers conveyed a belief in the person's guilt and suggested they had incriminating evidence; (11) whether the tone was aggressive or accusatory; (12) whether police used interrogation tactics designed to pressure the person; and (13) whether the person was arrested at the end of the interrogation. (*NavaAdame, supra*, 116 Cal.App.5th at pp. 16–17.)

"The prosecution has the burden of proving a defendant was not in custody." (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 445.) We review the trial court's factual findings for substantial evidence but independently decide if the interrogation was custodial. (*Ibid.*)

Based on the totality of the circumstances, we conclude defendant was subjected to a custodial interrogation long before he received *Miranda* advisements. The contact began with defendant's employer—the camp director—leading him to the awaiting detectives as soon as he arrived at work. Nothing suggests defendant was asked if he was willing to speak to the detectives and they never told him he was free to leave.

Although the interrogation occurred on the church campus, rather than a police station, the circumstances suggested this vacant office was not a familiar place for defendant, a camp counselor. (See *United States v. Carter* (8th Cir. 1989) 884 F.2d 368, 371–372 [bank president's office was not familiar surroundings for bank employee].) Inside, defendant was met with two detectives who, though wearing suits, presented a badge and were carrying firearms. (See *United States v. Fred* (10th Cir. 2009) 322 Fed.Appx. 602, 607 [agents' visible weapons and badges contributed to police-dominated atmosphere].) And though the detectives initially minimized the seriousness of this contact, they made clear that they were there because of allegations against defendant himself, explaining they wanted to "clear the air and figure out what's going on."

At this initial stage of the encounter, defendant was likely not yet in custody. Although the office door was closed, he was not physically restrained and was told he was not under arrest. And as the trial court noted, the initial conversation was "pleasant."

But that dynamic soon changed. (See *NavaAdame, supra*, 116 Cal.App.5th at pp. 18–19 [interrogation may begin as noncustodial but later become custodial].) As the interrogation progressed, the detectives increasingly conveyed that they already knew what had occurred and that the interview's purpose was to secure defendant's admission rather than

9

determine if misconduct had happened at all. One detective told defendant they already "kn[e]w" many of the answers to their questions. When defendant mentioned the camp buses, the lead detective advised him that the buses had cameras. This became a recurring theme in the interrogation. Whenever defendant offered innocuous explanations or minimized his conduct, detectives referenced cameras or expressly told defendant there was video of his actions—for instance, after defendant demonstrated how Victim 1 had supposedly touched him.

In addition to confronting defendant with invented incriminating evidence, the detectives used other, more subtle interrogation tactics by expressing sympathy for his conduct and suggesting he write apology letters. Together, these tactics amounted to what one court called "a classic two-pronged interrogation." (*People v. Saldana* (2018) 19 Cal.App.5th 432, 460 (*Saldana*).) On one hand, the detectives asserted conclusive evidence of guilt, leaving defendant no plausible alternative but to confess. On the other, they minimized defendant's moral blame and expressed (purported) understanding—at one point saying Victim 2 was a "good looking girl"—in a way designed to make confessing easier. This approach tended to create a "police-dominated atmosphere." (*Ibid.*) Under these circumstances, we cannot agree with the trial court's conclusion that detectives exerted "no pressure" on defendant.

Finally, although the detectives initially told defendant he was not under arrest, when he asked later in the interrogation if he was "getting arrested," the detective suggested he would be, saying that things were "not looking good for [him]." While the un-Mirandized portion of the interrogation lasted only about 40 minutes, a reasonable person would not have felt free to

10

terminate the encounter given the detectives' increasingly accusatory posture and intensifying control over the interrogation.

The circumstances here are at least as suggestive of custodial interrogation as those in *NavaAdame*, where we recently concluded the failure to provide *Miranda* warnings required suppression of the defendant's statements. (*NavaAdame, supra*, 116 Cal.App.5th at p. 5.) As here, officers there employed "multiple types of well-known interrogation techniques designed to elicit confessions," asserted knowledge of the suspect's guilt while minimizing moral blame, and encouraged him to provide the victim closure. (*Id.* at pp. 18–19.) But unlike defendant here, the suspect in *NavaAdame* initiated the contact with police himself and was told he was free to leave. (*Id.* at p. 10.) Yet we still concluded the latter portion of the interrogation was custodial. (*Id.* at p. 19.)

We are unpersuaded by the Attorney General's citation to *People v. Moore* (2011) 51 Cal.4th 386. Unlike here, the defendant there agreed to come to the station; he was assured he was there only to provide a statement and was free to leave; and investigators did not claim to have evidence of his guilt until after they arrested him. (*Id.* at pp. 402–403.)

We do not suggest the tactics the detectives used in interrogating defendant were improper. They may even be considered "good police work." (*Saldana, supra*, 19 Cal.App.5th at p. 460.) But good police work often requires *Miranda* warnings. They were required here; and defendant's statements should therefore have been suppressed.

## II.

### THE ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT

We cannot conclude the erroneous admission of defendant's confession was harmless. "A confession held inadmissible by reason of having

11

been obtained in violation of the prophylactic *Miranda* requirements is subject to a harmless-error standard of review specified in *Chapman v. California* (1967) 386 U.S. 18, 24." (*NavaAdame, supra*, 116 Cal.App.5th at p. 21 (cleaned up).) Under that standard, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.* (cleaned up).)  "To say that an error did not contribute to the verdict is to find that error unimportant in relation to everything else the jury considered on the issue in question." (*Id.* at pp. 21–22 (cleaned up).)

The erroneous admission of defendant's confession cannot be regarded as unimportant. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) "[C]onfessions often operate as a kind of evidentiary bombshell which shatters the defense" and are thus "much more likely to be prejudicial." (*People v. Neal* (2003) 31 Cal.4th 63, 86 (cleaned up).)

Here, the prosecution significantly relied on defendant's confession during closing argument. Among other things, the prosecutor used defendant's statements to establish his conduct and intent, demonstrate consciousness of guilt, and refute innocent explanations for his actions. The prosecutor reminded jurors they could replay the recorded interview during deliberations.

We agree with the Attorney General that the remaining evidence against defendant was robust. Victim 1 provided compelling testimony that was consistent with both her forensic interview and her contemporaneous report of the incident. Her account was further supported by evidence of her emotional state when making the initial report and by corroboration that she

12

called her mother during the incident. Photos from defendant's devices independently confirmed the inference that defendant had a sexual interest in young girls. And the testimony of Victims 3 and 4 strengthened Victim 1's account by suggesting both a disposition to commit sexual offenses against children and a distinctive M.O.—sitting next to young girls on the camp bus and forcing their hands to his penis.

At the same time, the prosecution's case depended heavily on credibility determinations and was not free from arguable weaknesses. No physical evidence or other independent corroboration established the core allegations involving any of the victims. Victims 3 and 4 disclosed their allegations only after details of Victim 1's accusations had become public— Victim 3 after one year and Victim 4 after several. And Victim 3 initially denied any incident to her mother.

Under these circumstances, we cannot say beyond a reasonable doubt that defendant's confession did not contribute to the verdict. The confession substantially strengthened the prosecutions' effort to persuade the jury that Victim 1's account was truthful. And once the jury credited Victim 1's allegations, the testimony of Victims 3 and 4 also became more persuasive in establishing defendant's guilt on the remaining charges.

The Attorney General wrongly contends the jury's acquittal on the charge concerning Victim 2—who was included in defendant's confession—shows that the jury "did not put credence" in the confession. This contention neglects to account for the corpus delicti rule, which required independent evidence that the crime occurred. The jury could have fully credited defendant's confession—even as to Victim 2—yet concluded the evidence was legally insufficient. The trial court instructed the jury on corpus

delicti and confirmed, in response to the jury's question, that the rule applied to defendant's confession.

We decline the Attorney General's invitation to consider defendant's testimony at trial in assessing harmlessness. When an illegally obtained confession is erroneously admitted, the defendant's testimony will not render the error harmless unless it is shown beyond a reasonable doubt that the defendant did not take the stand "'in an attempt to mitigate the explosive impact of a confession which had left his case in ruin.'" (*People v. Marlow* (2004) 34 Cal.4th 131, 151.) The Attorney General makes no such showing here.

Because the erroneous admission of defendant's un-Mirandized confession was not harmless beyond a reasonable doubt, the judgment must be reversed.

## DISPOSITION

The judgment is reversed and the matter is remanded. The People shall have 60 days from issuance of the remittitur to decide whether to retry defendant for the charges concerning Victims 1, 3, and 4.

SCOTT, J.

WE CONCUR:

MOORE, ACTING P. J.

GOODING, J.

15