Filed 5/24/13  P. v. Lottes CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID BAKER LOTTES,<br><br>    Defendant and Appellant. | A135490<br><br>(Del Norte County<br>Super. Ct. No. CRF12-9082) |

**I.**

**INTRODUCTION**

Appellant was convicted of battery resulting in serious bodily injury.  The victim of the crime testified that appellant hit her on the head and slashed her with a knife.  Appellant contends the trial court erred in failing to instruct the jury that it needed to reach unanimous agreement as to which of these acts constituted the battery.  Appellant also contends that the trial court should not have permitted the victim to testify about having been hit on the head, because this evidence was not presented at the preliminary hearing.  Finally, appellant contends that the trial court should have stricken a witness's comments comparing appellant's appearance to that of Charles Manson, because they were more prejudicial than probative.  We find no error warranting reversal of appellant's conviction, and therefore affirm.

1

## II.

## FACTS AND PROCEDURAL BACKGROUND

The events leading to appellant's arrest and conviction occurred during the evening of February 8, 2012, in and near a trailer occupied by Robert Grimes. The trailer was located on a ranch in Del Norte County owned by Jerry and Sandra Webster.[1] Grimes was an acknowledged alcoholic, and the Websters previously had called the police several times because of disturbances at Grimes's trailer.

Four people visited Grimes in his trailer during the evening in question: Roberta Rhodes, who worked for the Websters as a ranch hand; her husband or boyfriend, Paul Samples, and appellant and his girlfriend, Paula May Norris,[2] a couple with whom Rhodes was acquainted. Samples lived with Rhodes in another trailer near Grimes's trailer. Rhodes, who normally did not drink for medical reasons, consumed two 24-ounce bottles of malt liquor before arriving at the trailer.

There was a bar located fairly near Grimes's trailer. Norris and appellant were not allowed in the bar, and Norris often asked Samples to buy liquor for her there.[3] Rhodes, appellant, and Norris all testified that during the evening of February 8, 2012, Samples agreed to buy alcohol for Norris, and then delivered it to her at Grimes's trailer. They related varying versions of how this came about, however, and gave flatly inconsistent accounts of what happened after Samples arrived at Grimes's trailer.

According to Rhodes, Samples was with her in their trailer when Norris asked him to buy alcohol for her, and Norris and Samples then left the trailer together. Rhodes

---

[1] For the purpose of clarity and brevity, we will refer to Jerry and Sandra Webster by their first names.

[2] At trial, Norris gave her name as Paula May Norris Sanderson, but she was referred to as Norris during trial and in the briefs on appeal. We will refer to her as Norris.

[3] Sandra testified that appellant and Norris frequently went to Grimes's trailer to ask him or Samples to buy alcohol for them, and often ended up "getting in a big hassle" on these occasions. Jerry testified that appellant knew he was not supposed to be on the Websters' property.

stayed and continued to watch television, but eventually, when Samples failed to return, she became concerned and went to Grimes's trailer to look for him. Rhodes expected to find appellant and Norris at Grimes's trailer as well. When Rhodes arrived at Grimes's trailer, Samples was not there, but Norris was, along with appellant and Grimes, who was asleep.[4] Rhodes asked where Samples was, and then sat down inside the trailer to wait for him. Shortly after that, Samples arrived and handed appellant a bottle of liquor. Both Samples and Rhodes then told appellant that he and Norris should leave, since the Websters did not want them to be on the ranch property.

Soon after Samples arrived at the trailer, he left to go to bed, and Rhodes told him she would follow him soon. Rhodes was talking with appellant and Norris, reiterating that they should leave Grimes's trailer, when she was suddenly hit on the head and rendered unconscious.[5] When she awoke, she was outside the trailer lying on the ground on her back, missing her jacket, her shirt, and one of her shoes. She felt her leg being stabbed, and saw appellant standing over her holding a small knife and chanting what Rhodes described as "Satanic shit." She lost consciousness again, but soon revived. Fearing for her life, she tried to get up, but appellant grabbed her, told her she was not going anywhere, and cut her again with the knife, this time on the left side of her torso. She said, "Please don't kill me," and passed out again. The next time Rhodes awoke, she was alone. Bleeding and fearing for her life, she ran to the Websters' house for help, yelling hysterically that "Crazy Dave" (appellant's nickname) had stabbed her.

According to appellant, the course of events was totally different. After appellant and Norris encountered Samples, Samples went with them to Grimes's trailer; left briefly to purchase Norris's alcohol; and then arrived back at Grimes's trailer before Rhodes did, and had a drink with him and Norris. Rhodes arrived soon after that; immediately

---

[4] Grimes testified that he passed out or blacked out from alcohol consumption that night, and had no recollection of what occurred in his trailer.

[5] Rhodes gave accounts of the incident to several witnesses prior to trial. Each of these accounts is summarized *post*. Rhodes's accounts were consistent in identifying appellant as her assailant, but varied in other respects.

punched Samples in the face; and then attacked Norris.[6] After a scuffle between the two women, appellant asked Rhodes why she hit Samples, and urged her to leave along with Samples, who was in the process of departing. Rhodes then approached appellant, grabbed at his hair, and tried to scratch his eyes. As appellant tried to defend himself, he and Rhodes fell out of the trailer together. Ultimately, appellant succeeded in freeing himself from Rhodes, and she immediately walked away. Appellant denied having a knife or sharp instrument in his possession at the time; denied making any witchcraft-related utterances or conducting a séance; and stated that he tried not to harm Rhodes in the course of defending himself against her attack.

Norris also testified that Rhodes arrived at Grimes's trailer soon after Samples did. According to Norris, an argument then ensued between Samples and Rhodes, who was angry with Samples for not purchasing any liquor for her. Rhodes punched Samples in the nose, and then lunged at Norris, yanking her hair and trying to grab the bottle. During the ensuing struggle, Rhodes fell backwards out of the trailer, which angered Rhodes even further. Rhodes then reentered the trailer and attacked appellant, grabbing his hair and scratching his face. Rhodes was thrown out of the trailer again while struggling with appellant, who was trying to defend himself. Finally, Samples offered Rhodes a beer, and they left together. Rhodes did not scream or show any signs of injury during the altercation. Soon after that, the Websters arrived and asked appellant and Norris to leave, and they complied.

Both of the Websters testified at appellant's trial. Sandra said that at around 9:30 p.m. that night, as she was walking from her house to the barn, she heard "crashes and bangs and thumps" coming from Grimes's trailer. She confirmed Rhodes's testimony that shortly after that, Rhodes ran to the Websters' house, screaming, and pounded on the front door. Jerry let Rhodes in, and Sandra, who heard Rhodes's approach from the barn, arrived soon after that. When Rhodes arrived at the Websters' house, she was clothed only in a bra from the waist up; was wearing only one shoe; and was muddy, scratched,

---

[6] Rhodes denied punching Samples, or arguing with either Samples or Norris.

4

and bruised. Rhodes was also bleeding from cuts on her thigh and torso, and kept repeating that she had been stabbed. She looked as though she were going to have a black eye, and had a knot on the left side of her face.

Sandra called 911, and she and Jerry spent a few minutes caring for Rhodes. They then left their house, with Rhodes inside behind a locked door, and walked to Grimes's trailer to check on him. Sandra intended to confront Grimes's guests and "run them off the property," as she and Jerry had done several times before. No one responded to the Websters' knock on the trailer door, so they opened it, and found appellant squatting or sitting in front of the wood stove, looking as though he were about to start a fire. Sandra described appellant as having "Manson eyes," and said he "reminded [her] of Manson." Norris and Grimes were also in the trailer. Grimes looked as if he had just emerged from the bedroom or bathroom, and was "stupid drunk" and incoherent. The Websters told appellant and Norris that they had to leave. Both of them initially refused, and Norris argued about it, but appellant eventually persuaded her that they had to leave because "the man" had arrived.

The Websters then returned to their house, where they found Rhodes still hysterical and terrified. She told the Websters that appellant had knocked her out, held her down, tried to stuff something like herbs into her mouth, and then stabbed her while standing over her chanting.

Del Norte County Deputy Sheriff Enrique Ortega arrived at the ranch around 10:50 p.m. Ortega could not interview Rhodes initially, because she was hysterical and highly intoxicated. Eventually, Rhodes told Ortega that while she was at Grimes's trailer, appellant conducted a séance or witchcraft of some kind just outside the trailer, in the course of which appellant stabbed her in the chest with a dagger. Rhodes repeatedly said appellant had stabbed her, but due to her intoxication, she could not supply any further details.

Ortega saw an open three-or four-inch long laceration on Rhodes's left chest, which was bloody but not actively bleeding. He did not examine her face closely, but did not see any specific injuries there. The photographs Ortega took at the time showed

5

wounds on Rhodes's leg, arm, and chest, and revealed that her cheeks were swollen, and there was redness around her lips. Rhodes was taken to the hospital shortly after Ortega spoke with her.

Ortega then tried to interview Grimes and Samples. Grimes was in his trailer, but was too intoxicated to communicate. Ortega did not see any blood or sign of a struggle inside the trailer, and could not find a dagger or other sharp bladed instrument in the area. Samples, who was also intoxicated and passed out inside his own trailer, was unable to provide Ortega with any useful information. Ortega did not observe any injury to Samples's face.

At around 11:40 p.m., another Del Norte County sheriff's deputy arrived to assist Ortega. The two officers went to appellant's residence, which was a cottage or shed on the property of William Hugoboom.[7] Hugoboom told the officers that he had seen appellant and Norris leaving appellant's cottage around 9:30 p.m. that evening, and returning around 10:30 or 10:45 p.m. According to Hugoboom, at the time the officers arrived, appellant had been asleep, but was "pretty sober."

Appellant appeared to Ortega to have been drinking, but not to be completely intoxicated. He admitted having been at Grimes's trailer earlier in the evening, but denied stabbing Rhodes. Norris also admitted being at Grimes's trailer. She told the officers appellant did not stab Rhodes, and that if they were going to arrest someone for Rhodes's stabbing, it should be her. Norris explained at trial that she did not actually stab Rhodes, but was angry at Ortega for arresting appellant. The officers arrested appellant.

At the emergency room, Rhodes was attended to by nurse Jay Hodges, to whom Rhodes appeared to be still "grossly inebriated." Rhodes repeatedly told Hodges that "This guy tried to kill me." Hodges determined that Rhodes had lacerations on her left abdomen and thigh. They were superficial "slashes" rather than stab wounds, and were not life-threatening. Both wounds had been made with a very sharp instrument, like a

---

[7] Appellant had lived with Hugoboom for many years and had a father-son relationship with him, though they were actually only friends. Appellant helped to take care of Hugoboom, who usually used a wheelchair.

6

scalpel.  The chest wound was glued closed; the thigh wound was glued closed, and then possibly sutured by a doctor, though Hodges did not perform any suturing himself. Rhodes also had some soft tissue swelling on her scalp near the forehead, but no obvious head wounds.  According to Rhodes, an area around her temple swelled up the following day.  She also had two black eyes, marks on her neck, and a "little slice" on her hand that still showed a scar at the time of trial.

Ortega tried to obtain a more detailed statement from Rhodes at the hospital, but she was still too intoxicated to provide one.  John Trombetti, who testified in appellant's defense and knew Rhodes slightly, saw her at the hospital that night and described her as looking "messed up," as though "she [had been] shot out of a cannon."  Trombetti testified that Rhodes approached him, and in the course of a "rambling" conversation, told him repeatedly that two men, one of whom had "wild hair,"[8] had dragged her into a cow pasture, threatened to poke her eyes out, and stabbed her with a large knife like a bayonet or butcher knife.  Rhodes denied that she had told Trombetti this version of the events.  She testified at trial that she told Trombetti it was appellant who stabbed her.

Later that night, Samples found Rhodes's jacket and glasses inside Grimes's trailer, and her missing shoe outside it.  Rhodes's green shirt remained missing. However, the day before appellant's trial in April 2012, Jerry moved Grimes's wood box in order to refill Grimes's wood supply, and Sandra found a stained, rolled up shirt, teal green or teal blue in color, stuffed underneath the box.

Appellant was charged in count 1 with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)[9]), with an enhancement allegation charging infliction of great bodily injury (§ 12022.7), and in count 2 with battery resulting in serious bodily injury (§ 243, subd. (d)), with an enhancement allegation charging use of a deadly weapon (§ 12022, subd. (b)).  The jury acquitted appellant on count 1, and was unable to reach a verdict on the deadly weapon enhancement on count 2, but convicted appellant on count 2.  On

---

[8] At the time of the incident, as well as at the time of trial, appellant wore his hair long.

[9] All further references to statutes are to the Penal Code unless otherwise noted.

May 10, 2012, appellant was granted four years formal probation, with a condition requiring him to serve a 210-day jail term.  This timely appeal ensued.

## III.

## DISCUSSION

## A.  Failure to Give Unanimity Instruction

Appellant contends that Rhodes's testimony described two separate incidents that could potentially support a felony battery charge, the first being the blow to her head, and the second being the knife slashes inflicted on her chest and leg.  Based on his characterization of these as two separate acts, and on the prosecution's failure to elect between the two, appellant contends that the trial court erred in failing to give a unanimity instruction.

It is a longstanding general principle of criminal procedure that "[w]hen an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.  [Citation.]"  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 (*Melhado*).)  The type of jury instruction required by *Melhado* is commonly referred to as a unanimity instruction.  However, when a criminal charge is based on " 'acts . . . so closely connected that they form part of one and the same transaction,' " no unanimity instruction is required.  (*People v. Gunn* (1987) 197 Cal.App.3d 408, 412; see also *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1427.)

Here, the evidence does not indicate that there was any significant lapse of time or break between Rhodes's being hit in the head and her being slashed.  Thus, there was no evidence that appellant's battery of Rhodes was anything other than a single, unified course of conduct.  Therefore, no unanimity instruction was required.

Appellant's reliance on *Melhado*, *supra*, 60 Cal.App.4th 1529, as his principal authority for this argument is misplaced.  In that case, the defendant was charged with making a criminal threat.  The defendant had taken his car to a repair shop, and the

8

manager refused to return the car until the defendant paid for the repairs. Appellant visited the shop on three occasions during a single day. On the first occasion, at 9:00 or 9:30 a.m, appellant told the manager he would " 'blow [him] away' " if he did not return the car, and that he was going home to get a grenade. On the second occasion, at 11:00 a.m., appellant approached the manager, pulled out a real-looking grenade, and again threatened to " 'blow you away' " and to " 'blow up this place.' " When appellant returned for the third time, at 4:30 p.m., the manager called the police, and the defendant was arrested. (*Id.* at pp. 1532-1533.) The trial court in *Melhado* refused the defendant's request for an instruction that in order to convict the defendant of making a criminal threat, the jurors must unanimously agree on the specific act constituting the offense. (*Id.* at p. 1532.) Division Three of this District reversed the conviction, concluding that the defendant's statements during each of his first and second visits to the repair shop qualified as a criminal threat, and that the trial court committed reversible error by failing to instruct the jury that it had to agree unanimously as to which one of the acts constituted the charged crime.

*Melhado*, *supra*, 60 Cal.App.4th 1529, is clearly distinguishable on its facts. In *Melhado*, the evidence established that there were two separate and distinct occasions on which the defendant made remarks on which the criminal threat charge could have been based. Between those two occasions, the defendant left the scene for over an hour. As we noted above, here the blow to Rhodes's head and the infliction of knife wounds occurred as part of a single event, closely connected in time and place.

Moreover, " '[a] unanimity instruction is required only if the jurors could . . . disagree which act a defendant committed and yet convict him of the crime charged.' [Citations.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 93.) Here, the evidence that Rhodes was slashed by a sharp-edged object was undisputed; photographs of her wounds were shown to the jury, and both of the Websters, as well as the emergency room nurse, confirmed that she had lacerations on her chest and leg. The only factual issue was how the wounds were inflicted. On that point, the jury could either believe Rhodes, and find that appellant hit her on the head and slashed her, or it could believe appellant and Norris,

9

and find that appellant did not harm Rhodes. There was no evidentiary basis on which a reasonable juror could have concluded that appellant harmed Rhodes, but *only* by hitting her on the head. Thus, the jurors could not reasonably have convicted appellant of battery without unanimously finding that appellant was the person responsible for Rhodes's lacerations. For all of the foregoing reasons, the trial court's failure to give a unanimity instruction was not reversible error under the circumstances of this case.

### B.  Introduction of Evidence Not Presented at Preliminary Hearing

The sole prosecution witness at appellant's preliminary hearing was Ortega. He related Rhodes's account of the evening, including her statement that appellant stabbed her. Ortega did not mention anything at the preliminary hearing about Rhodes having been hit on the head. As already noted, however, when Rhodes herself testified at trial, she said she had been hit on the head and knocked unconscious before appellant slashed her with the knife. Rhodes and other witnesses also testified that Rhodes had a lump or swelling consistent with her having sustained a blow to the head. Appellant contends that the introduction of this evidence was a violation of due process, because it constituted an alternative basis for his conviction that was not presented at the preliminary hearing. (See *People v. Burnett* (1999) 71 Cal.App.4th 151, 166-168 (*Burnett*).)

Respondent contends that appellant has forfeited this argument due to his trial counsel's failure to object to the introduction of the evidence. Appellant counters that if his trial counsel's acquiescence constituted a forfeiture, then his counsel rendered ineffective assistance at his trial. In the interest of judicial economy, in order to forestall a future habeas corpus petition, we will exercise our discretion to address this issue on the merits without determining whether or not appellant's contention was forfeited. (See *People v. Marlow* (2004) 34 Cal.4th 131, 150; *People v. Butler* (2003) 31 Cal.4th 1119, 1128; *People v. Chaney* (2007) 148 Cal.App.4th 772, 780; see also *Burnett*, *supra*, 71 Cal.App.4th at pp. 178-183.)

As authority for his contention, appellant relies primarily on *Burnett*, *supra*, 71 Cal.App.4th 151. In *Burnett*, the defendant was charged with possessing and brandishing a .38-caliber revolver during a confrontation with the parents of two young girls. The

evidence at the preliminary hearing indicated that the defendant had possessed or brandished only a single weapon. At the defendant's trial, the prosecution amended the information by striking the description of the gun as a .38-caliber revolver. The prosecution then introduced evidence that later on the same day, a friend of the defendant returned to him, not a .38-caliber revolver, but a different gun, a .357-caliber revolver, which the friend had been keeping for him. The prosecution told the jury it could convict the defendant based on his possession of either gun. A divided panel of Division Two of this court reversed, based on "the clear illegality of prosecuting or convicting appellant of an offense different from and *not transactionally related* to the one shown by the evidence at the preliminary hearing . . . ." (*Burnett*, *supra*, 71 Cal.App.4th at p. 178, italics added.)

This italicized language in *Burnett*, *supra*, 71 Cal.App.4th 151, sufficiently distinguishes it from this case. In *Burnett*, the defendant's two gun possessions occurred in the presence of different witnesses at different times, and were not in any way related. Here, on the other hand, appellant's battery of Rhodes constituted a single, brief, continuous incident. Thus, the introduction of evidence at trial that appellant hit Rhodes on the head as well as slashing her with a knife did not charge a new or different criminal act. It simply constituted additional evidence supporting the same battery charge disclosed by the evidence at the preliminary hearing.

Appellant also relies on *People v. Levy* (1973) 31 Cal.App.3d 427. In *Levy*, the defendant was charged with narcotics and weapons offenses. No mention was made at the defendant's preliminary hearing of any prior convictions. After the defendant's first trial resulted in a mistrial, the prosecution amended the information by adding allegations that the defendant had two prior felony convictions; removing the two previously charged misdemeanor weapons counts; and adding a new felony count for possession of a firearm by a felon. The defendant successfully sought a writ of prohibition precluding him from being tried on the new felony firearm charge, which was premised on the existence of the prior convictions. *Levy* is distinguishable; it involved the use of evidence completely unrelated to that presented at the preliminary hearing to support elevating a misdemeanor

11

to a felony. Accordingly, we are not persuaded that the trial court erred in permitting the introduction of the evidence that Rhodes was hit on the head.

### C. Admission of Testimony that Appellant Resembled "Manson"

During her testimony, Sandra was asked to describe appellant's "appearance" and "physical characteristics" at the time she and Jerry went to Grimes's trailer to ask appellant and Norris to leave their property. Sandra responded by recalling that she remarked to Jerry at the time that appellant had "Manson eyes" and stating that appellant "reminded [her] of Manson" when he looked at her. Both defense counsel and the trial judge understood these remarks to refer to the notorious killer Charles Manson, and the prosecutor admitted as much, though he disclaimed any advance knowledge that Sandra was going to make such a reference in her testimony. Appellant's trial counsel objected to this testimony, moved to strike it, and moved for a mistrial. The trial court denied the motions. Appellant contends this was error.

Despite appellant's attempt to paint the references as "character evidence," it is clear from the context that Sandra was describing appellant's physical appearance, not his behavior or character. Accordingly, the evidence was not improper character evidence under Evidence Code section 1101.

Appellant also argues that the trial court should have excluded the evidence as more prejudicial than probative under Evidence Code section 352. Assuming for the sake of argument that this point was preserved by trial counsel's motion to strike and for a mistrial, we review the trial court's ruling for abuse of discretion. (*People v. Anderson* (2001) 25 Cal.4th 543, 591; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) "When asked to exclude evidence as more prejudicial than probative . . . , the trial court has broad discretion. Its ruling will not be disturbed on appeal unless the prejudicial effect of evidence so admitted clearly outweighed its probative value. [Citations.]" (*People v. Anderson*, *supra*, 25 Cal.4th at p. 591.) Similarly, whether the admission of such evidence due to a witness's unanticipated remark warrants granting a mistrial or giving a curative instruction is also an issue committed to the discretion of the trial court. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1581.)

In the overall context of the evidence adduced at appellant's trial, we are not persuaded by appellant's argument that Sandra's brief, passing references to appellant's perceived physical resemblance to Manson were inflammatory or highly prejudicial. Accordingly, we perceive no abuse of discretion or reversible error in the trial court's denial of appellant's motions to strike and for a new trial.

## IV.
## DISPOSITION

The judgment is affirmed.


_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.